# EXHIBIT 5

**LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT OF**

**ARCH 550 METROPOLITAN AVE LLC**

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of October 2, 2019, by and between ARCH MM 550 METROPOLITAN AVE LLC, a Delaware limited liability company (together with its permitted successors and assigns, "Managing Member") and each of the other Persons party hereto (the "Non-Managing Members").

WHEREAS, the Managing Member and the Non-Managing Members (each a "Member" and collectively, the "Members") desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

ARTICLE I

CERTAIN DEFINITIONS

1.1.   Certain Defined Terms.  As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A)   Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B)   Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"BBA" shall have the meaning set forth in Section 5.5.1.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A)     The initial book value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B)     The book values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the partnership representative; provided, however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above need not be made if the partnership representative reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member.

2

(C)     The book value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D)     The book values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's book value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, the two days of Rosh Hashanah, Yom Kippur, the first two days of Sukkot, Shemini Atzeret, Simchat Torah, the first two days and last two days of Passover, the two days of Shavuot or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement as may be amended from time to time by the Managing Member to reflect increases and decreases thereto as set forth in this Agreement, including without limitation Section 3.2 and Section 4.2.

"Capital Event" shall mean any transaction which results in the Company or a Subsidiary's receipt of cash or other consideration other than from ongoing operations, if any, and Capital Contributions, including proceeds of sales or exchanges or other dispositions of property other than obsolete property, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds

"Capital Event Proceeds" shall mean the gross proceeds derived from a Capital Event less the expenses incurred in connection with such Capital Event and less the application of such proceeds to the reduction of existing Company indebtedness, the discharge or payment of any other expenses or liabilities and the establishment of permitted reserves.

"Certificate of Formation" means that certain Certificate of Incorporation of Arch 550 Metropolitan Ave LLC, dated and filed with the Secretary of State of the State of Delaware on _____ __, 2019.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means the limited liability company formed under the Act and governed by the terms of this Agreement and the Certificate of Formation.

"Contributing Member" shall have the meaning set forth in Section 3.2.2.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Cram-Down Contribution" shall have the meaning set forth in Section 4.2.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the partnership representative in accordance with Section 1.704-1(b)(2)(iv)(g)(3) of the Regulations.

"Dissolution Event" shall have the meaning set forth in Section 9.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excess Contributions" means Capital Contributions made pursuant to Section 3.2.2(ii) by the Managing Member unless the Non-Managing Members elect to fund their pro rata share thereof.

"Failed Contribution Amount" shall have the meaning set forth in Section 3.2.2.

"First Preferred Return" means, respect to the applicable Member, the aggregate amount accrued and calculated in the same manner interest would be calculated if such Member's Unreturned Capital Contribution constituted a loan bearing interest at the rate of 12.0% per annum, cumulative and compounded annually.

"Fiscal Year" shall be as set forth in Section 10.1.

"Indemnifying Member" shall have the meaning set forth in Section 12.1.1.

"Indemnitee" shall have the meaning set forth in Section 12.1.2.

"Liquidating Agent" shall have the meaning set forth in Section 9.3.1.

"Managing Member" shall have the meaning set forth in the Preamble.

"Member" shall have the meaning set forth in the Recitals.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Member Loan" shall have the meaning set forth in Section 3.2.2.

"Net Cash Flow" for any period, (a) the gross revenues of the Company and its Subsidiaries from all sources for such period (but excluding Capital Event Proceeds and Capital Contributions), *less* (b)(i) any amounts required to pay the costs and expenses of the Company and its Subsidiaries incurred for such period including, without limitation, the fees payable pursuant to Section 6.2, (ii) any debt service payments (including amortization) on any indebtedness of the Company and its Subsidiaries, (iii) any capital expenditures of the Company and its Subsidiaries and (iv) any increases in the Company's reserves, as reasonably determined by Managing Member, including reserves established for future capital expenditures, working capital or for future debt service payments (including amortization) on any Company indebtedness, *plus* (c) any released or reduced Company reserves, as reasonably determined by Managing Member.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i)     items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii)    any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii)   any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv)    there shall be taken into account any separately stated items under Section 702(a) of the Code;

899777_1

(v)     if the Book Value of any Company asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi)     items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Contributing Member" shall have the meaning set forth in Section 3.2.2.

"Non-Managing Member" shall have the meaning set forth in the Preamble.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Percentage Interest" means, with respect to each Member, the percentage determined by dividing such Member's aggregate Capital Contributions by the aggregate Capital Contributions of all Members.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Property" means that certain parcel of real property and the improvements situated thereon located at 550 Metropolitan Avenue, Brooklyn, New York.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Second Preferred Return" means, respect to the applicable Member, the aggregate amount accrued and calculated in the same manner interest would be calculated if such Member's Unreturned Capital Contribution constituted a loan bearing interest at the rate of 17.0% per annum, cumulative and compounded annually.

"Subsidiary" means any corporation, limited liability company or other single purpose entity, all or any of the ownership interests in which are owned directly or indirectly by the Company.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

6

"Third Preferred Return" means, respect to the applicable Member, the aggregate amount accrued and calculated in the same manner interest would be calculated if such Member's Unreturned Capital Contribution constituted a loan bearing interest at the rate of 22.0% per annum, cumulative and compounded annually.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Unreturned Capital Contribution" means, with respect to the applicable Member, the amount, if any, by which the aggregate amount of the Capital Contributions made by such Member exceeds the cumulative amount of distributions to such Member pursuant to Section 5.7.2(ii).

## ARTICLE II

## ESTABLISHMENT OF THE COMPANY

2.1.    Formation of the Company.  The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the Delaware Limited Liability Company Act, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement.  Upon the execution of this Agreement, the Members shall be members of the Company.  The execution and filing of the Certificate of Formation is hereby ratified and confirmed in all respects.

2.2.    Company Name.  The business of the Company shall be conducted under the name of "Arch 550 Metropolitan Ave LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates.  In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3.    Purposes.  The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes:

2.3.1.   to, directly or indirectly, acquire, own, hold, manage, maintain, finance, refinance, and otherwise deal with the Property in such manner as Managing Member shall determine, in its sole and absolute discretion (subject to Section 6.1.3); and

2.3.2.   to do any and all things which may be necessary, incidental, or convenient to carry on the business of the Company as described herein and which are permitted under the Act, all on the terms and conditions set forth herein.

2.4.    <u>Principal Place of Business and Address</u>.  The principal place of business of the Company shall be located at 524 Broadway, Suite 405, New York, New York 10012, or at such other place as Managing Member may designate.  The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5.    <u>Term</u>.  The existence of the Company commenced as of the date of the filing of the Certificate of Formation o and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6.    <u>Registered Office</u>.  The registered office of the Company in the State of Delaware shall be in care of such agent for service of process or such other address as may be designated from time to time by Managing Member; <u>provided</u>, that the Company shall at all times maintain a registered agent and a registered office in the state of Delaware.

2.7.    <u>Admission of Members</u>.  Non-Managing Members and Managing Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8.    <u>Limitation on Liability</u>.  Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

ARTICLE III

CAPITAL CONTRIBUTIONS

3.1.    <u>Initial Capital Contributions</u>.  On the date hereof, each Member shall contribute to the Company cash the amount set forth opposite such Member's name on <u>Exhibit A</u> under the column "<u>Initial Capital Contribution</u>".

3.2.    <u>Additional Capital Contributions</u>.

3.2.1.   At any time and from time to time following the date hereof, if the Managing Member reasonably determines that the Company or any Subsidiary requires additional funds for any purpose, to the extent such funds are not obtained through borrowings, the Managing Member shall call for additional Capital Contributions by providing written notice thereof (a "<u>Capital Call Notice</u>") to the Members which notice shall set forth the amount of capital required by the Company and the use of the funds so requested.  Within ten (10) Business Days of the Capital Call Notice, then each Member shall be required to make an additional Capital Contribution to the Company in an amount equal to the amount so requested in such Capital Call Notice multiplied by such Member's Percentage Interest.

3.2.2.   If a Member fails to make its capital contribution required by <u>Section 3.2.2</u> (the "<u>Non-Contributing Member</u>"), as and when due, for any reason, and such failure

8

899777_1

continues for two (2) Business Days following the receipt by the Non-Contributing Member of written notice of such default, then the Member who has made its capital contribution pursuant to the Capital Call Notice (the "Contributing Member") shall have the right to either (i) demand a return of its additional Capital Contribution made in accordance with the Capital Call Notice, if any, or (ii) make a further additional capital contribution equal to the capital contribution the Non-Contributing Member failed to make (the "Failed Contribution Amount").  If the Contributing Member elects to make a further additional capital contribution equal to the Failed Contribution Amount, then, subject to Section 3.2.3, the Failed Contribution Amount shall be treated as a loan from the Contributing Member to the Non-Contributing Member (a "Member Loan") followed immediately by a contribution of the Non-Contributing Member to the Company.  Each Member Loan shall:  (i) have an initial principal amount equal to the Failed Contribution Amount made by the applicable Contributing Member to the applicable Non-Contributing Member; (ii) bear interest at a rate of 18% per annum compounded monthly (the "Member Loan Rate"); (iii) be non-recourse to the applicable Non-Contributing Member; (iii) unless otherwise agreed to by the applicable Non-Contributing Member, be payable solely out of any distributions that would otherwise thereafter be distributable to the applicable Non-Contributing Member in accordance with Section 5.7; (iv) be secured by the Non-Contributing Member's Member Interest (and the Non-Contributing Member to which a Member Loan is made does hereby grant to each Contributing Member or other Person making such Member Loan a first priority security interest in and to all of such Non-Contributing Member's Member Interest); and (v) be repayable at any time in whole or in part without premium or penalty.  Each Non-Contributing Member shall, upon request, execute such security agreements and financing statements as may from time to time be requested by the Contributing Member(s) or other Person making a Member Loan to such Non-Contributing Member to better assure the security interest in such Non-Contributing Member(s)' Member Interest granted hereby and, effective upon the making of any Member Loan, hereby irrevocably constitutes and appoints the Contributing Member(s) or other Person making such Member Loan as its true and lawful attorney-in-fact, coupled with an interest, to make, execute on behalf of the Non-Contributing Member, consent to, swear to, acknowledge, deliver, record and file such documents and instruments as may be necessary in the sole discretion of the Contributing Member(s) or other Person to confirm and render fully effective all remedies thereof in connection with such Member Loan.

> 3.2.3.   The Contributing Member may, by delivering a notice to the Non-Contributing Member at any time following the date that shall be one hundred eighty (180) days after the making of such Member Loan and prior to the full repayment of such Member Loan (and all accrued and unpaid interest  thereon), elect to terminate such Member Loan and have the Non-Contributing Member's Percentage Interest diluted as set forth in this Section 3.2.3, with the outstanding principal amount of the Member Loan, together with the accrued and unpaid interest thereon, treated as a Capital Contribution to the Company ("Default Contribution") and the Capital Accounts of the Non-Contributing Member and the Contributing Member adjusted accordingly. If a Member Loan is converted into a Default Contribution, then as of the date of such conversion, (A) the Contributing Member will be deemed to have made a Default Contribution in the amount of 150% of the outstanding principal balance under such Member Loan, (B) the Non-Contributing Member shall be treated as receiving a distribution in the amount of 150% of the outstanding principal balance under the Member Loan which distribution shall be deemed as having repaid the Member Loan in full and (C) the Member Loan shall be deemed refunded and shall be null and void.

3.3.    Right to Lend.  Notwithstanding anything in this Agreement to the contrary, if the Managing Member determines that the Company or any Subsidiary requires additional funds for any purpose and such funds are needed prior to the date on which an additional Capital Contribution is to be made, the Managing Member may lend such funds to the Company or such Subsidiary, which loan shall bear interest at 8% per annum provided that the Managing Member promptly delivers a Capital Call Notice following the making of such loan.

3.4.    No Interest.  Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.5.    Return of Capital.  No Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company.  In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.6.    No Personal Liability.  Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in Section 6.6.1.

## ARTICLE IV

## CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS

4.1.    Capital Accounts.   A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2.  Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2.    Adjustments.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2.  The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2.  If the Contributing Member elects to make a further additional capital contribution equal to the Failed Contribution Amount, the Contributing Member's Capital Account shall be increased by an

10

additional amount equal to one-half of the Failed Contribution Amount (the "Cram-Down Contribution") and the Non-Contributing Member shall be treated as receiving a distribution under Section 5.7.2(ii) in the amount of the Cram-Down Contribution and its Capital Account shall be decreased by such amount.

4.3.    Negative Capital Accounts.  No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4.    Transfers.  If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5.    Capital Account Balance.  Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

ARTICLE V

ALLOCATIONS AND DISTRIBUTIONS

5.1.    Allocations of Net Profit and Net Loss.  After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3 hereof if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets.  Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2.    Regulatory Allocations.

5.2.1.    Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in

Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2.   This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3.   To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4.   If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5.   Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6.   It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3. Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

5.3.    <u>Tax Allocations</u>.

5.3.1.    For federal income tax purposes, except as otherwise provided in this <u>Section 5.3</u>, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to <u>Sections 5.1</u> and <u>5.2</u>.

5.3.2.    In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution).  If the Book Value of any Company asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company asset shall take account of any variation between the adjusted basis of such Company asset for federal income tax purposes and the Book Value of such Company asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3.    If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers an Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in <u>Sections 5.1</u> and <u>5.2</u>) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Managing Member.

5.4.    <u>Withholding</u>.  The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("<u>Taxing Authority</u>") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member.  Any funds withheld from a distribution by reason of this <u>Section 5.4</u> shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.  If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand.  The amount of a Member's reimbursement obligation under this <u>Section 5.4</u>, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) prime rate published in the Wall Street Journal on the date of payment plus two percent (2.0%) per annum, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder.  Each Member's reimbursement obligation under this <u>Section 5.4</u> shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member.  Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have.  Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member.  Any amount payable as indemnity hereunder by a Member will be paid promptly

13

to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

5.5.    <u>Tax Matters</u>.

5.5.1.    <u>Partnership Representative</u>.    Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Bipartisan Budget Act of 2015 (the "<u>BBA</u>"), as well as for purposes of any state, local, or non-U.S. tax law.  Managing Member shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the BBA.  The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative.  The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement.   The provisions contained in this <u>Section 5.5.1</u> shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2.    <u>Tax Elections</u>.  All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Managing Member, in its good faith discretion; <u>provided</u>, <u>however</u>, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Managing Member, nor any Member, nor the Company, shall take any action inconsistent with such intent.  The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Managing Member reasonably believes, will produce the most favorable tax results for the Members.  The Company and the Managing Member shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3.    <u>Tax Returns</u>.  The Managing Member shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications, elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries.

5.6.    <u>Section 754 Election</u>.  In the event a distribution of Company assets occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained.  Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

5.7.    <u>Distributions</u>.

14

5.7.1.   The Company shall distribute Net Cash Flow to the Members, as and when determined by Managing Member but no earlier than forty-five (45) days after the end of each calendar quarter, in the following amounts and order or priority:

(i)   first, to each Member, pari passu, in accordance with their respective Percentage Interests until each Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (i) and clause (i) of <u>Section 5.7.2</u> equal to the greater of (1) such Members' First Preferred Return or (2) their respective aggregate Capital Contributions multiplied by 25%;

(ii)   second, (x) to the Managing Member its Percentage Interests plus 10% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests until each such Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (ii) and clause (iii) of <u>Section 5.7.2</u> equal to the greater of (1) such Member's Second Preferred Return or (2) its aggregate Capital Contributions multiplied by 65%;

(iii)   third, (x) to the Managing Member its Percentage Interests plus 20% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests until each such Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (iii) and clause (iv) of <u>Section 5.7.2</u> equal to the greater of (1) such Members' Third Preferred Return or (2) their respective aggregate Capital Contributions multiplied by 100%; and

(iv)   thereafter, (x) to the Managing Member its Percentage Interests plus 30% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests.

For the avoidance of doubt, Non-Contributing Members shall have 100% of potential distributions used to repay Member Loan prior to receiving any distributions in accordance with this Section 5.7.1.

5.7.2.   Capital Event Proceeds shall be distributed to the Members within forty-five (45) Business Days of the receipt by the Company of such Capital Event Proceeds in proportion to their respective Percentage Interests

(i)   first, to each Member, pari passu, in accordance with their respective Percentage Interests until each Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (i) and clause (i) of <u>Section 5.7.1</u> equal to the greater of (1) such Members' First Preferred Return or (2) their respective aggregate Capital Contributions multiplied by 25%;

(ii)   second, to the Members on a pro rata basis in accordance with their respective Percentage Interests pari passu, until each Member (other than Non-

Contributing Members) have received aggregate distributions pursuant to this clause (ii) equal to such Member's Unreturned Capital Contributions;

(iii)    third, (x) to the Managing Member its Percentage Interests plus 10% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests until each such Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (iii) and clause (ii) of <u>Section 5.7.1</u> equal to the greater of (1) such Member's Second Preferred Return or (2) its aggregate Capital Contributions multiplied by 65%;

(iv)    fourth, (x) to the Managing Member its Percentage Interests plus 20% and (y) the balance to the Members (other than the Managing Member) pari passu, in accordance with their respective Percentage Interests until each such Member (other than Non-Contributing Members) has received aggregate distributions pursuant to this clause (iv) and clause (iii) of <u>Section 5.7.1</u> equal to the greater of (1) such Members' Third Preferred Return or (2) their respective aggregate Capital Contributions multiplied by 100%; and

(v)    thereafter, (x) to the Managing Member its Percentage Interests plus 30% and (y) the balance to the Members pari passu, in accordance with their respective Percentage Interests.

For the avoidance of doubt, Non-Contributing Members shall have 100% of potential distributions used to repay Member Loan prior to receiving any distributions in accordance with this Section 5.7.1.

5.8.    <u>Distributions Restricted by the Act</u>.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

<u>ARTICLE VI</u>

<u>MANAGEMENT AND OPERATIONS</u>

6.1.    <u>Management</u>.

6.1.1.   The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in <u>Section 6.1.3</u> below), full, exclusive and complete discretion with respect thereto.  Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in <u>Section 2.3</u>.  Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform, including, without limitation, the power to:

16

(i) conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation and this Agreement;

(ii) open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii) acquire, lease, finance, pledge and dispose of all or any portion of the Property;

(iv) enter into any contract or endorsement in the name or for the account of the Company;

(v) employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(vi) bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vii) deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(viii) maintain such reserves as the Managing Member deems advisable; and

(ix) cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company.

6.1.2. Except as otherwise provided in this Agreement, Non-Managing Members shall not participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

6.1.3. Notwithstanding anything to the contrary contained in this Agreement, the following decisions or actions by the Company or any Subsidiary (each a "Major Decision") shall be undertaken only with the prior written consent of Non-Managing Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if

17

made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Non-Managing Member if such Non-Managing Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i)     acquisition of any direct or indirect interests in any real property (other than the Property);

(ii)     filing, acquiescing to, consenting to or taking of any Bankruptcy Action;

(iii)     merging, consolidating or other reorganization of the Company or any Subsidiary with another Person;

(iv)     entering into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company and/or any Subsidiary on the other hand; except as provided in Section 6.2 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v)     entering into any amendment or modification to this Agreement except to the extent such amendment or modification does not materially adversely effect the rights of the Non-Managing Members; and

(vi)     causing any Subsidiary to take any of the foregoing.

6.2.     <u>Managing Member Fees and Expenses</u>.

6.2.1.   In connection with the operation of the Property, Managing Member shall cause the Company or its Subsidiary to pay the following fees to Managing Member, its Affiliate, or an affiliate of the managing Member of the Subsidiary (without duplication therefor):

(i)     a structuring fee of $100,000 payable upon the execution of this Agreement;

(ii)     a development fee of $500,000 payable in equal monthly draws over the time period which the Project is expected to be completed;

(iii)     until the issuance of a temporary certificate of occupancy for the Project, a construction management fee in an amount of five percent (5%) of the gross cost of such construction project;

(iv)     a financing fee equal to one-half of one percent (0.5%) of the principal amount of the initial financing obtained by the Company and/or its Subsidiaries in connection it the Project;

(v)     a financing fee equal one percent (1.0%) of the principal amount of all financings secured, directly or indirectly, by the Property other than for the

initial financing obtained by the Company and/or its Subsidiaries in connection it the Project; and

(vi)     an asset management fee of either (x) if the residential component of the Property is being marketed as condominium units, $5,000 per month commencing sixty (60) days prior to anticipated issuance of a temporary certificate of occupancy for the Project or (y) if the residential component of the Property is being marketed as rental units, two percent (2%) of gross income from the residential component of the Property;

(vii)     a marketing fee not to exceed six percent (6%) of the gross sales price of such condominium unit;

(i)     if the residential component of the Property is being marketed as rental units, a property management fee, when added to any third-party property management fee paid for such residential units, not to exceed five percent (5%) of gross income from the residential component of the Property.

6.2.2.   The Company shall reimburse the Managing Member and its direct and indirect members whose sole purpose is to hold or manage another entity whose sole purposes is to invest, directly or indirectly, in the Company, for all third party costs and expenses incurred in connection with maintaining its legal existence, filing requisite tax returns and other reasonable costs incurred by the Managing Member in connection with the Company.

6.3.    <u>Legal Title to Company Property</u>.  Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary of the Company.

6.4.    <u>Other Activities of Members</u>.  Neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company.  Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments.  The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

6.5.    <u>Personal Liability</u>.  Notwithstanding anything herein to the contrary, no Member shall take any action that would result in any other Member having any personal liability for the obligations of the Company without the effected Member's written consent.

## ARTICLE VII

## TRANSFER OF MEMBERSHIP INTERESTS;

7.1.    <u>Restrictions on Transfers of Membership Interests</u>.  No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this <u>Article VII</u> and until all requirements and conditions stated in this <u>Article VII</u>, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member.  To the fullest extent permitted under applicable law, any Transfer in violation of this <u>Article VII</u> shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest.  No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

7.2.    <u>Permitted Transfers</u>.  Notwithstanding <u>Section 7.1</u>, but subject to the applicable provisions or terms of any loan to any Subsidiary or the Company, and <u>Section 7.5</u>, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, so long as such Member has provided the Managing Member with at least twenty (20) Business Days advance written notice, as follows ("<u>Permitted Transfers</u>"):

(i)    Transfers of a Member's Interest to another Member;

(ii)    Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual by will or by laws of intestate succession, to such individual's executors, administrators, testamentary trustees, legatees or beneficiaries;

(iii)    Transfers which do not effect a change in Control of such Member; or

(iv)    Transfers consented to by the Managing Member.

7.3.    <u>Additional Restrictions</u>.  Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and vo*id ab initio* if:

(i)    it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii)    it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii)    it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv)    the transferee is a Prohibited Person;

(v)    as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi)    in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

7.4.    Substitute Members. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a)    The Transfer complies with the provisions of this Article VII;

(b)    The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c)    The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

7.5.    Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 7.4, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member

upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

      7.6.   <u>Withdrawal, Retirement or Resignation of a Member</u>. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this <u>Section 7.6</u> shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

<u>ARTICLE VIII</u>

<u>REPRESENTATIONS</u>

      8.1.   <u>Representations</u>.  Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

      8.1.1.   other than an individual, it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

      8.1.2.   its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

      8.1.3.   there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

899777_1

8.1.4.   this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof;

8.1.5.   such Member is an accredited investor as such term is defined in Section 501 or Regulation D promulgated under the Securities Act of 1933, as amended; and

8.1.6.   (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

8.2.   Indemnity.   Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 8.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 8.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

ARTICLE IX

DISSOLUTION AND LIQUIDATION

9.1.   Dissolution.   This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

9.1.1.   Upon the unanimous election to dissolve by the Members; or

9.1.2.   Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article IX unless the Members otherwise unanimously agree.

9.2.   Statement of Intent to Dissolve.   In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the Secretary of State of Delaware.

9.3.    Procedures.

9.3.1.    Liquidation of Assets.    In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof.  In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

9.3.2.    Authority of Liquidating Agent.  In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

9.3.3.    Distribution of Assets.  Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 5.7.2.

9.4.    Termination of the Company.  Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

ARTICLE X

FISCAL AND ADMINISTRATIVE MATTERS

10.1.    Fiscal Year.  The fiscal year of the Company will be the calendar year.

10.2.    Checks, Drafts, Etc.  All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

10.3.    Books and Records.  Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law.  The Company's books and records will be kept at the principal place of business of Managing Member.

10.4.   Right of Inspection.   Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense.   Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

10.5.   Reports.

10.5.1. Within time periods set forth on Exhibit B attached hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on Exhibit B, which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.   As soon as reasonably possible after the end of each Fiscal Year, the Managing Member will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state, and local income tax returns for such Fiscal Year.

## ARTICLE XI

## CONFIDENTIALITY AND PRESS RELEASES

11.1.   Confidentiality.   The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

11.2.   Press Releases.   No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law.

## ARTICLE XII

## INDEMNIFICATION

12.1.   Indemnification.

12.1.1. Subject to the terms of Section 6.5, no Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("Indemnifying Member") shall have any liability to the Company or to any other Member for any loss suffered

by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this <u>Section 12.1.1</u> shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

12.1.2. Subject to the terms of <u>Section 6.5</u>, the Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "<u>Indemnitee</u>") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted gross negligence, fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this <u>Section 12.1.2</u> with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

12.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

12.2. <u>Exculpation/Member Indemnification</u>. Subject to <u>Section 6.5</u>, except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

ARTICLE XIII

MISCELLANEOUS

13.1.   Notices.

13.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth on Exhibit A.

13.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

13.1.3. Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 13.1 to the other Member.

13.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

13.2.   Attorneys' Fees.  In the event of any litigation between the parties hereto to enforce any of the provisions of this Agreement or any right of either party hereto, the unsuccessful party to such litigation agrees to pay to the successful party all costs and expenses, including reasonable attorneys' fees and disbursements, incurred herein by the successful party in and as part of the judgment rendered in such litigation

13.3.   Extension Not a Waiver.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same.  Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

13.4.   Entire Agreement; Amendments.   This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated.   Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

13.5.   Governing Law.   THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL

27

LAWS OF THE STATE OF DELAWARE WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

13.6.  <u>Venue</u>.  Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York.  Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

13.7.  <u>Headings</u>.  Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

13.8.  <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction.  In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

13.9.  <u>Failure to Enforce Provision</u>.  The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

13.10.  <u>Interpretation</u>.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

13.11.  <u>Assignment</u>.  This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement.  This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

13.12.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement.  The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes.  Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Arch MM 550 Metropolitan Ave LLC

By:      Jeffrey Simpson
Its:      Authorized Signatory

Address:

Initial Capital Contribution:  $465,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    608941 N.J.Inc.
Its:    CTO , SECRETARY

Address:

Initial Capital Contribution:  $535,119

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:     Michael Queller
Its:    An Individual

Address:

Initial Capital Contribution:  $50,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:      Yuval Greenblatt
Its:      An Individual

Address:

Initial Capital Contribution:    $92,668

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Morgan Jones
Its:    An Individual

Address:

Initial Capital Contribution:  $100,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:  Deborah Chassen
Its:  An Individual

Address: ██████████████████████

Initial Capital Contribution:  $50,000

Social Security Number/Tax ID: ████████████

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:      Raquel Jove
Its:      An Individual

Address:

Initial Capital Contribution:  $20,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:      Parch LIC LLC, Adam Peldman
Its:      Member

Address:

Initial Capital Contribution:  $100,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Roger Leifer & Max Leifer Partnership

By:    Roger Leifer
       Its: Partner

Address:

Initial Capital Contribution:  $75,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

Mal

By:     Mal Jones
Its:     An Individual

Address:

Initial Capital Contribution:  $50,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    David Jacobs
Its:    An Individual

AND

By:    Mary Beth Jacobs
Its:    An Individual

Address:

Initial Capital Contribution:  $25,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Pinkas Landau
Its:    An Individual

AND

By:    Judy Landau
Its:    An Individual

Address:

Initial Capital Contribution:  $20,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Hilary Gibson

Its:    An Individual

Address:

Initial Capital Contribution:  $100,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:   Glenn Harris
Its:   An Individual

Address:

Initial Capital Contribution:  $154,447

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Gregg Stuart
Its:    An Individual

Address:

Initial Capital Contribution:  $50,000

Social Security Number/Tax ID:

SIGNATURE PAGE TO
LIMITED LIABILITY COMPANY AGREEMENT
OF
ARCH 550 METROPOLITAN AVE LLC

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first set forth above.

By:    Thomas Haughton
Its:    An Individual

Address:

Initial Capital Contribution:  $100,000

Social Security Number/Tax ID:

Exhibit A

| Member Name | Initial Capital Contribution |
| --- | --- |
| Arch MM 550 Metropolitan Ave LLC | $465,000 |
| 608941 NJ Inc. | $535,119 |
| Pinkas Landau & Judy Landau | $20,000 |
| Deborah Chassen | $50,000 |
| Michael Queller | $50,000 |
| Morgan Jones | $100,000 |
| Mal Jones | $50,000 |
| David Jacobs & Mary Beth Jacobs | $25,000 |
| Raquel Love | $20,000 |
| Roger Leifer & Max Leifer Partnership | $75,000 |
| Parch LIC LLC | $100,000 |
| Hilary Gibson | $100,000 |
| Gregg Stuart | $50,000 |
| Glenn Harris | $154,447 |
| Yuval Greenblatt | $92,668 |
| Thomas Haughton | $100,000 |

899777_1

Exhibit B

Reports

1.      Within one hundred twenty (120) days after the end of each Fiscal Year:

      a.      a financial report of the Company, including a balance sheet and profit and loss statement of the Company for the year and a statement of changes in financial position, and a statement showing distributions to the Members all as prepared in accordance with Generally Accepted Accounting Principles consistently applied, and a statement showing allocations to the Members of taxable income, gains, losses, deductions and credits; and

      b.      a statement of the Capital Account of each Member.

2.      Within sixty (60) days after the end of each calendar quarter, a financial report of the Company which shall include:

      a.      a statement showing distributions to the Members;

      b.      general information regarding Property operations.